No. 22-80117

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

**BLACK LIVES MATTER LOS ANGELES, et al.,**
*Plaintiffs and Respondents,*

v.

**CITY OF LOS ANGELES, et al.**
*Defendants and Petitioners.*

Appeal from the United States District Court
for the Central District of California
Case No. 2:20-cv-05027-CBM-AS
Hon. Consuelo B. Marshall

## PLAINTIFFS' ANSWER/OPPOSITION TO DEFENDANTS' PETITION FOR PERMISSION TO APPEAL ORDER GRANTING CERTIFICATION OF PLAINTIFFS' CLASSES

**Barrett S. Litt**, SBN 45527
McLane, Bednarski & Litt, LLP
975 East Green St.
Pasadena, California 91106
Telephone: (626) 844-7660
Facsimile: (626) 844-7670
E-Mail: blitt@mbllegal.com

**Carol A. Sobel**, SBN 84483
LAW OFFICE OF CAROL A. SOBEL
1158 26th Street, #552
Santa Monica, CA 90403
Tel. 310 393-3055
Email: carolsobel@aol.com

**Paul Hoffman**, SBN 71244
SCHONBRUN, SEPLOW, HARRIS, HOFFMAN & ZELDES LLP
200 Pier Avenue, Suite 226
Hermosa Beach, California 90254
Facsimile: 310 399-7040
Email:hoffpaul@aol.com

# TABLE OF CONTENTS

TABLE OF CONTENTS........................................................................2

TABLE OF AUTHORITIES.................................................................3

I.    PRELIMINARY STATEMENT .......................................................6

II.   STATEMENT OF FACTS ...........................................................8

      A. The Arrest Damages Class.................................................12

      B. Infraction Class ...............................................................14

      C. Direct Force Class............................................................16

III.  THE TRIAL COURT MADE THE NECESSARY FINDINGS THAT
COMMON ISSUES PREDOMINATE........................................18

IV.  WHETHER THE BANE ACT ALLOWS CLASS ACTIONS DOES NOT
JUSTIFY THE GRANT OF THE PETITION. ...........................25

V.   TRYING THIS CASE IS NOT IMPRACTICABLE..................26

VI.  CONCLUSION.........................................................................28


CERTIFICATE OF COMPLIANCE......................................................30

CERTIFICATE OF SERVICE FOR ELECTRONIC FILING.............31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aichele v. City of Los Angeles*,
   314 F.R.D. 478 (C.D. Cal. 2013) .................................................................. 6, 14

*Amchem Products, Inc. v. Windsor*,
   521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) ..................................... 21

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
   568 U.S. 455, 133 S. Ct. 1184 (2013) ............................................................ 15

*Armstrong v. Davis*,
   275 F.3d 849 (9th Cir. 2001) ....................................................................... 24

*Barham v. Ramsey*,
   434 F.3d 565 (D.C. Cir. 2006) ...................................................................... 6

*Chamberlan v. Ford Motor Co.*,
   402 F.3d 952 (9th Cir. 2005) ................................................................ 6, 7, 25

*Chang v. U.S.*,
   217 F.R.D. 262 (D.D.C. 2003) ..................................................................... 6

*Chua v. City of Los Angeles*,
   2017 WL 10776036 (C.D. Cal. May 25, 2017) ................................................. 6

*Dellums v. Powell*,
   566 F.2d 167 (D.C.Cir.1977) ....................................................................... 6

*Don't Shoot Portland v. City of Portland*,
   2022 WL 2700307 (D. Or. July 12, 2022) ....................................................... 24

*Green v. Baca*,
   226 F.R.D. 624 (C.D. Cal. 2005) .................................................................. 10

*Hickey v. City of Seattle*,
   236 F.R.D. 659 (W.D.Wash. 2006) ............................................................... 6

*In re Bridgestone/Firestone, Inc.*,
   288 F.3d 1012 (7th Cir. 2002) ..................................................................... 27

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
   522 F.3d 6 (1st Cir. 2008) .......................................................................... 27

*In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No.*,
 725 F.3d 244 (D.C. Cir. 2013) ................................................................ 27

*MacNamara v. City of N.Y.*,
 275 F.R.D. 125 (S.D.N.Y. 2011) ............................................................ 6

*Montiel v. City of Los Angeles*,
 2 F.3d 335 (9th Cir. 1993) ..................................................................... 10

*Moss v. U.S. Secret Serv.*,
 2015 WL 5705126 (D. Or. Sept. 28, 2015) ........................................... 23

*Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles*,
 246 F.R.D. 621 (C.D. Cal. 2007) ...................................................... 6, 23

*Nelson v. City of Davis*,
 685 F.3d 867 (9th Cir. 2012) ................................................................. 18

*Prado–Steiman ex rel. Prado v. Bush*,
 221 F.3d 1266 (11th Cir.2000) .............................................................. 27

*Spalding v. City of Oakland*,
 2012 WL 994644 (N.D. Cal.) ................................................................. 6

*Szabo v. Bridgeport Machines, Inc.*,
 249 F.3d 672 (7th Cir. 2001) ................................................................. 27

*Tel. Co. of Southwest v. Falcon*,
 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) ........................ 20

*Torres v. Madrid*,
 141 S. Ct. 989, 209 L. Ed. 2d 190 (2021) ............................................. 18

*Torres v. Mercer Canyons Inc.*,
 835 F.3d 1125 (9th Cir. 2016) ............................................................... 19

*Tyson Foods, Inc. v. Bouaphakeo*,
 577 U.S. 442, 136 S. Ct. 1036, (2016) .................................................. 21

*Vallario v. Vandehey*,
 554 F.3d 1259 (10th Cir. 2009) ............................................................... 6

*Vodak v. City of Chicago*,
 2006 WL 1037151 (N.D.Ill.) .................................................................... 6

## Statutes

California Penal Code §835.5 ............................................................... 8

Civil Code § 52.1 ............................................................................... 25

Penal Code §835.5 ....................................................................... 8, 22

Penal Code §853.6 ............................................................................ 15

## Rules

Fed.R.Civ.P.23(b)(3)................................................................... passim

Fed.R.Civ.P. 23(c) (1)(C) .................................................................. 20

Fed.R.Civ.P. 23(f) ..................................................................... passim

FRE 801(d)(2)(D) .............................................................................. 10

## Other Authorities

2 W. *Rubenstein*, *Newberg on Class Actions* § 4:50 (5th ed. 2012)....................... 22

## I.   PRELIMINARY STATEMENT

Defendants file this Rule 23(f) petition despite decades of courts certifying Rule 23(b)(3) protest class actions. *See, e.g., Dellums v. Powell*, 566 F.2d 167 (D.C.Cir.1977); *Chang v. U.S.*, 217 F.R.D. 262, 273 (D.D.C. 2003); *Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles*, 246 F.R.D. 621, 625 (C.D. Cal. 2007); *Vodak v. City of Chicago*, 2006 WL 1037151, 1 (N.D.Ill.); *Spalding v. City of Oakland*, 2012 WL 994644 (N.D. Cal.); *Hickey v. City of Seattle*, 236 F.R.D. 659, 664 (W.D.Wash. 2006); *Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006); *MacNamara v. City of N.Y.*, 275 F.R.D. 125, 151-54 (S.D.N.Y. 2011); *Aichele v. City of Los Angeles*, 314 F.R.D. 478 (C.D. Cal. 2013); *Chua v. City of Los Angeles*, 2017 WL 10776036 (C.D. Cal. May 25, 2017).

This Court has broad discretion in deciding whether to grant a timely Rule 23(f) petition. Rule 23(f) "interlocutory appeal[s are] … the exception rather than the rule," and "should be granted sparingly." *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959-960 (9th Cir. 2005). "[I]interlocutory appeals are traditionally disfavored and for good reason"; they are "necessarily disruptive, time-consuming, and expensive" for the parties and the courts." *Vallario v. Vandehey*, 554 F.3d 1259, 1262 (10th Cir. 2009) (citing, *inter alia, Chamberlan,* 402 F.3d at 959).

Nonetheless, "there are *rare cases* in which interlocutory review is preferable to end-of-the-case review." *Id.,* at 960 (emphasis supplied). For such "rare *cases*",

*Chamberlan* identified three circumstances in which "[r]eview …will be most appropriate": 1) "a death-knell situation … independent of the merits of the underlying claims, coupled with a class certification decision … that is questionable;" 2) "the certification decision presents an unsettled and fundamental issue of law relating to class actions…likely to evade end-of-the-case review;" or "(3) the district court's class certification decision is manifestly erroneous." *Ibid*.

Defendants' petition does not meet these stringent criteria. Primarily, they contend that the decision below was manifestly erroneous because it purportedly did not make a predominance determination. But, when read in its totality, the Court did determine that common questions predominate for all three classes. There was substantial evidence supporting that conclusion from the City's commissioned reports and Los Angeles Police Department ("LAPD") documents. Defendants also contend that the Bane Act cannot sustain a class action (which would not defeat certification because there is a parallel false arrest claim), and that trying the case as a class action is impracticable (despite the numerous cases cited above certifying such cases and the strong common liability evidence for each class). Defendants fail to explain why this is the "rare case," in which interlocutory review should be granted.

## II. STATEMENT OF FACTS

Throughout the country, including Los Angeles, there were widespread protests after George Floyd's death. The largest LA protests were concentrated during five-days (May 29-June 2, 2020, the "class period"). Over four thousand people were arrested and held for hours for no legitimate reason on cramped, unventilated buses, while tightly handcuffed behind their backs and without access to bathrooms, food, or water. Most arrestees were transported to makeshift detention sites far from the arrest site. After being detained through this gratuitous, unnecessary process, most arrestees faced the LAPD Catch-22 of getting home in the middle of the night under the threat of rearrest for curfew violations.

Several hundred arrestees were subjected to custodial arrest solely on infractions (LA Municipal Code §80.02), expressly punishable only by a fine no greater than $250. Under California Penal Code §835.5, field release was mandatory so long as the protestors provided identification upon request (which all did). Even for misdemeanor offenses not encompassed by §835.5, the LAPD has mobile field resources to check for warrants and book alleged violators in the field in approximately 15 minutes, as they routinely do with traffic violations. Instead, arrestees were held in painfully tight handcuffs for hours, waiting for transportation to a booking site, being transported, and waiting on buses to reach and at the makeshift processing centers. Booking and immediately releasing at the station

should have taken no more than approximately one hour. Ex. 124 [Dkt. 136-35.] From past protest arrests, and from directives previously issued by the Defendants and introduced in support of the motion for class certification, Defendant LAPD Police Chief Michael Moore and the LAPD knew this and had all the means needed to process people in the field and avoid subjecting them to unconstitutional confinement conditions.

In the course of the protests, Moore authorized and ratified widespread use of batons and "less lethal" munitions, which struck hundreds of protestors who posed no threat of imminent harm to police officers or anyone else. There were dozens of serious injuries, including many head injuries. The LAPD ultimately conceded massive failures in its response to the protests, including the failure to train on use of these munitions.

The factual record before the District Court for class certification was extensive. Three independent reports commissioned by Los Angeles officials assessing LAPD's response to the George Floyd protests in LA, all of which are published on LA City websites, were introduced: 1) The LA City Council commissioned Independent Examination Of The Los Angeles Police Department

2020 Protest Response by Gerald *Chaleff* ("*Chaleff* Report")[1]; 2) the LAPD's Safe

LA After Action Report ("After Action Report"); and 3) the Los Angeles Police

Commission's "A Crisis of Trust," by the National Police Foundation ("NPF

Report")[2]. These reports are admissible under both FRE 801(d)(2)(D) as a party

statement (*see, e.g., Green v. Baca*, 226 F.R.D. 624, 635–36 (C.D. Cal. 2005), and

FRE 803(8) as a government report (*see, e.g., Montiel v. City of Los Angeles*, 2 F.3d

335, 341–42 (9th Cir. 1993). Plaintiffs also relied on the Declaration of Carol Sobel

and its exhibits, addressing evidence from LAPD records.

The LAPD's Floyd protest response arose after a long history of lawsuits,

settlements and consent decrees intended to rein in LAPD's history of unlawfully

shutting down First Amendment protected protests through failing to provide proper

unlawful assembly notices, failing to provide reasonable opportunity to disperse,

failing to provide dispersal directions, unleashing unreasonable and excessive force

against protestors, kettling and detaining or arresting protestors (including those

arrested on infractions who were entitled to field release on a promise to appear),

engaging in punitive arrests, holding arrestees on buses without water in tight

handcuffs, and failing to release people entitled to Own Recognizance release. See

---

[1] KM_C554e-20210310155205 (lacity.org)
[2] http://lapd-assets.lapdonline.org/assets/pdf/a_crisis_of_trust_final.pdf

*Chaleff* Report, pg. 10 (citing LAPD "history of legal settlements and agreements that it entered into after lawsuits were filed in connection with police conduct at large events: in 2000 (Democratic National Convention); 2007 (MacArthur Park incident); 2011 (Occupy LA); and 2014 (Ferguson demonstrations). In each settlement, there were mandates …[to] correct policy, procedures, and training regarding various components of the management of protests and demonstrations," some of which were not maintained. "Crowd control, mobile field force, mass arrest procedures and less lethal training were all insufficient.")

Plaintiffs moved to, and the Court did, certify an injunctive relief class and three damages classes. The Injunctive Relief Class consists of past, present, and future people in Los Angeles who participate in protests, especially around police issues. The three damages classes are confined to May 29-June 2, 2020, during which the LAPD engaged in the same pattern in breaking up protests throughout the City, arresting many protestors and confining them on buses for protracted periods while handcuffed behand their backs without access to food or water, and indiscriminately unleashing less lethal weapons and batons against protestors. The three damages classes (Arrest, Infraction and Direct Force) and supporting evidence are summarized in the following sections. See Class Certification Order at pgs. 2-3 for the full class definitions.

## A. THE ARREST CLASS

The Arrest Class is composed of people who 1) attended the George Floyd protests and were arrested during the class period on various infraction or misdemeanor charges (see class definition, Dkt. 174: 1-2 for details) and 2) were held on buses, where they were subjected to prolonged tight handcuffing, denied access to bathrooms, water and food, and held in enclosed spaces without ventilation. The LAPD arrested more than 4,000 people during the five-day class period. Sobel Dec., ¶¶ 45-50. The arrestees were uniformly tightly handcuffed, first at the arrest sites and then on the buses; on the buses, they were without water or bathroom access and held for hours in those conditions. See e.g., Exhibits 103, 113, 115, 116 (Class Representatives TRO Declarations); Sobel Dec. III(A), ¶¶ 51-90.

In addition to the Class Representatives' declarations, Plaintiffs relied significantly on the findings of the *Chaleff* Report that, on 5/29-5/31, "LAPD arrested and detained individuals for exceedingly long periods of time" (Finding # 48, pg. 62); that arrestees "were detained for hours while handcuffed and were not provided with water or the use of bathroom facilities and were held in close conditions without masks during a pandemic environment" (Finding # 49, pg. 63; see also pgs. 46-47); that LAPD had "not corrected the issues related to detention and arrests identified in the 2011 Occupy LA and the 2014 Ferguson protests" (Finding # 50, pg. 63); that there was inadequate preparation and planning for

potential mass arrests, resulting in "a last-minute, uncoordinated effort to manage the arrests of more than 4,000 individuals", for which there were insufficient personnel "to process the arrestees and a lack of buses or vans to transport them to the field jails." Arrestees were held while handcuffed for "exceedingly long periods of time before buses" arrived; the "field jail locations were miles from arrest locations" resulting in releasing people at times when they "were again in violation of the curfew"; those assigned to the field jails "had not received training on field jail procedures"; and LAPD inappropriately used the UCLA Jackie Robinson Stadium as a field jail. *Id.,* Finding #s 46, 50, 51, 53, 54, 55, 56, pgs. 62-63.

The vast majority of arrestees "were detained handcuffed without water or bathroom access on average for well over four hours," with many in the 6-8 hour range. Sobel Dec., ¶ 90 (summarizing LAPD data). The minimum time spent for those handcuffed and detained on buses was 2-2½ hours, and that was likely not more than a few dozen arrestees. *Id.*, ¶ 78.

The problems of bus detentions with "tight handcuffs for an extended period of time" and "deni[al of] access to bathroom facilities or water" were to have been corrected after the protests for Occupy LA 2011 and Ferguson 2014, but were not. *Chaleff* Report*.*, pg. 17. "Despite having nearly a decade to revise and exercise custody procedures, the LAPD did not have an adequate arrestee processing

procedure in place resulting in arrestees being in handcuffs for extended periods of time and arrestees allegedly not being allowed access to bathroom facilities or water," *ibid.*, even though the Occupy LA Settlement provided that arrestees would "not be placed on transportation buses with tight handcuffs for an extended period of time," and would "not be denied access to bathroom facilities or water while held in police custody." *Id.*, pg. 85.

## B. INFRACTION CLASS

The *Chaleff Report* also explained that the early arrests were for violation of an infraction only – LAMC Section 80.02 (failure to obey a lawful order of a police officer). "Over the course of several days of protests, prior to the declaration of a curfew, most of the arrests by LAPD were" for this same infraction, *id*, pgs. 46-47, even though state law prohibited such arrests. Many of the arrests "made on Thursday, Friday, and Saturday [May 29-31] were made under" that infraction Municipal Code Section, which "require[ed] a citation and release in the field." *Id.*, Finding #47, pg. 62.

The *Chaleff* Report also concluded that LAPD "has not corrected the issues related to detention and arrests identified in the 2011 Occupy LA and the 2014 Ferguson protests." *Id.*, Finding #50, pg. 63. The 2011 Occupy LA lawsuit, *Aichele v. City of Los Angeles*, 314 F.R.D. 478 (C.D. Cal. 2013), certified an OR [Own Recognizance] Subclass on essentially the same legal theory as that advanced in the

current case (there, that those arrested were entitled to OR release under Penal Code §853.6; here, that they never should have been arrested and were entitled to field release under §853.5). *See Chaleff Report*, pg. 46 ("An infraction is like a traffic ticket, in that the person arrested is only required to show proof of identification and sign a promise to appear in order to be released at the location of the traffic stop").

Although Plaintiffs have not yet completed their examination of LAPD records, they estimate, based on LAPD documents and class member reports, that the number exceeds 700. Sobel Dec., ¶¶ 91, 100-104. The City's records will identify who is in the class, and the question for each class member is the same: whether their arrest was lawful since they were only charged with an infraction. The evidence shows that the Infraction Class members were subjected to the same course of conduct; that LAPD officers were not trained despite past virtually identical violations; and that no action was taken to correct these violations.

That Plaintiffs and Defendants disagree over whether Defendants' Infraction Class conduct is actionable is of no consequence for class certification; once the class is certified, the answer applies to the class. "Rule 23(b)(3) requires [only] … that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 459, 133 S. Ct. 1184 (2013).

## C. DIRECT FORCE CLASS

As previously explained, substantial evidence shows that Chief Moore directed, authorized and ratified the wanton use of force against protestors. The LAPD Safe LA Report identified four types of less-lethal munitions used against the protestors: 37mm less-lethal foam rubber baton; the 40mm Less-Lethal Launcher; the Beanbag Shotgun; and the Stinger Grenade .60 caliber. Safe LA 2020: p. 72. Over 10,000 rounds of less-lethal munitions were used. *Id.* at p. 74. The *Chaleff* Report preliminarily concluded that "the majority of injuries reported occurred from the deployment of the 40mm rounds." *Id.*, pg. 44. Proper use of the 40mm requires a "greater level of training, marksmanship and competency," which training was lacking for most of the officers authorized to use the 40mm weapons. See *Chaleff* Findings # 38 (lack of supervisorial direction over use of the 40mm), #s 40-42 (40mm requires high level of training, and last general officer training was 2018), # 44 (LAPD directive authorizing the use of 40mm has no detailed guidance on use in public order policing situations), pg. 45. "The 40mm training was problematic for several reasons," including that one engaged in criminal conduct may be standing behind those engaged in lawful conduct, requiring a very precise use of the 40mm, and highly trained and skilled officers; otherwise "individuals who are not involved in criminal activity can unintentionally be hit and injured." *Id.*, pg. 8. Numerous class member declarations attested that the less lethal projectiles were used

16

indiscriminately against crowds and hit people who were doing nothing but standing and protesting, or running away to avoid being shot, *see, e.g.,* Declarations of Moore, Roe, Contreras, and Crnko[3] even though 40 mm rounds are only permissible "in crowd control situations against a single subject/suspect as a target-specific less lethal option," and may not "be used to disperse a crowd." *Chaleff* Report, pgs. 41-42. See also Sobel Dec. ¶¶ 108-120. Similarly, the 37 mm was used indiscriminately, including extensively on May 29 and May 30.

The 37 mm munition is ordinarily restricted to being fired as skip rounds, aimed in front of the target and bouncing up to strike an individual no higher than the shin. Although LAPD policy explicitly requires a supervisor to authorize the use of the 37mm munition as a direct-impact weapon based on consideration of the specific threat of serious harm, in the Floyd protests, supervisors gave blanket authorization to shoot people with 37-mm munitions without limitation. Consequently, many people suffered serious injuries from 37 mm weapons. See Sobel Dec. ¶¶ 121-128.

Batons were widely used improperly in violation of LAPD policy, which only allows the use of a baton as an impact device where there is violence or an imminent

---

[33] Moore - Dkt. 136-10 [Ex. 53]; Crnko – Dkt. 169, pp. 16-18; Ex. 150, pp. 6-14 [Dkt. 159], Roe – Dkt. 169, pp. 29-35; Contreras – Dkt. 155-2 [Ex. 150]

threat of violence or physical harm. Specifically, they were used as offensive weapons to inflict baton strikes against peaceful protestors who had their avenues of exit closed off by the police. See Sobel Dec. ¶¶ 130-134.

A Fourth Amendment seizure occurs when officers "by means of physical force or show of authority terminates or restrains freedom of movement through means intentionally applied." *Nelson v. City of Davis*, 685 F.3d 867, 875 (9th Cir. 2012) (citations and quotation marks omitted). *See Torres v. Madrid*, 141 S. Ct. 989, 1003, 209 L. Ed. 2d 190 (2021) ("the application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued"). Here, physical force was used to restrain class members. The legality of the use of "less-lethals" or batons resulting in striking people not engaged in threatening conduct is a common question.

## III. THE TRIAL COURT MADE THE NECESSARY FINDINGS THAT COMMON ISSUES PREDOMINATE.

Defendants contend that the District Court made no findings as to whether common questions predominate; no findings "from which the district court's thoughts on the matter might be divined; and "nothing from which to infer the district court did its duty 'to take a close look' at the question." Petition, pg. 18. On this basis, Defendants contend that there was per se error, requiring reversal of the class certification order. But a careful analysis of the Court's order establishes that it did

make the necessary findings, even if it did not use the word "predominance" in doing so.

The District Court acknowledged that Rule 23(b)(3) required that common questions predominate (and that Rule 23(c)(4) allowed for certification with respect to particular issues). Dkt. 174-4. The Court made findings that the "Direct Force Class's *Monell* claims concern a common question about the LAPD's ratification of the individual officers' use of less-lethal force and subsequent failure to discipline the officers for any misconduct." Id., 174-7. The Court then quoted *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016) that the *Monell* issues presented "important questions apt to drive the resolution of the litigation." This statement from *Torres* occurs in a section of the opinion entitled "Rule 23(b)(3) predominance." The full context in which that phrase appears states, "Predominance is not, however, a matter of nose-counting. .... Rather, *more important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis* over individualized questions." *Id*. at 1134 (emphasis supplied). It is obvious, when viewed in context, that the Court found that the *Monell* issues predominated over individual questions for the Direct Force Class.

Regarding the Arrest Class, the Court found that Defendants' challenges were to the merits of the claim, that their challenges to differences in the length of the

detentions did not defeat commonality, and that the evidence presented regarding class members' confinement were sufficiently common. Although the Court did not use the term predominance, it is again obvious from the opinion as a whole that the Court made a predominance finding. This is particularly so because the Court's superiority/manageability findings – an element of Rule 23(b)(3) certification – clearly reflect that the Court found that common issues predominated for each class when it stated, in reference to each of the classes, that "liability can be readily determined on a class-wide basis." Dkt. 174-16. Importantly, the Arrest Class does not challenge the legality of their arrests, only the lawfulness of the common conditions they were all subjected to once arrested.

A class certification order "may be altered or amended before final judgment." Fed.R.Civ.P. 23(c) (1)(C). *See, e.g., Gen. Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (certification order is "inherently tentative"; court has "flexibility" to modify it at any time). Since the number of arrestees would satisfy the numerosity requirements for a separate class action each protest day and each arrest location lawsuit, the Court can address whether modifications are appropriate as the case proceeds. For example, 750 people were arrested in one location on one day (June 2) under the same circumstances, handcuffed, held on buses, and ultimately transported across town where they were

held for more hours on buses while waiting to be booked in a parking lot, all of which took over 8 hours. This would satisfy Rule 23(b)(3) for a separate class action. Like this group, for almost all arrests over this five-day time period, people were transported on buses that held between 40 and 60 people, experienced the same conditions and the same amount of time handcuffed, held on buses, with no access to bathrooms, water, or food. Each bus held sufficient arrestees to satisfy numerosity. While the Arrest Class could be divided into several different class actions, that approach would ultimately would create a far larger caseload for the court.

The finding that liability can be determined on a classwide basis necessarily indicates a conclusion that common questions predominate because the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), and determining that liability can be determined on a classwide basis does precisely that. As the Supreme Court explained in *Tyson Foods, Inc. v. Bouaphakeo,* 577 U.S. 442, 453, 136 S. Ct. 1036, 1045, (2016):

> a common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." 2 W. *Rubenstein*, *Newberg on Class Actions*

§ 4:50, pp. 196–197 (5th ed. 2012) ….The predominance inquiry "asks

whether the common, aggregation-enabling, issues in the case are more

prevalent or important than the non-common, aggregation-defeating,

individual issues." *Id.*, § 4:49, at 195–196. When "one or more of the central

issues in the action are common to the class and can be said to predominate,

the action may be considered proper under Rule 23(b)(3)"

The Court's superiority finding establishes that it found that liability could be

determined based on common evidence and that those liability issues predominated

for all three damages classes.

This same analysis regarding the Court's superiority finding applies to the

certification of the Infraction Class. Defendants' main argument below was that the

Infraction Class members' claims did not meet the commonality requirement

because they did not give rise to a cause of action for a constitutional violation.

The Court concluded that this was a merits issue, and therefore did not defeat

certification. (Thus, the Court did not address Plaintiffs' counter-argument that

their Bane Act and false arrest claims did not require a constitutional violation;

violation of Penal Code §835.5 was sufficient for both.) While predominance was

not expressly addressed in that section of the Order, the Court similarly concluded

that "liability can be readily determined on a class-wide basis," Dkt. 174-16, meaning that common questions predominate.

Defendants further contend that the conclusion of a *Monell* violation is not a sufficient basis for class certification. That is wrong. The *Monell* claims here were based on a pattern and practice not only for the five days in question, but the years' long repetition of substantially identical practices; policymaker direction, authorization and ratification; failure to discipline; and failure to train. Determinations of command staff responsibility as the basis for class certification are well-established. Thus, in *Moss v. U.S. Secret Serv.*, 2015 WL 5705126, at **4–5 (D. Or. Sept. 28, 2015), the court certified a damages class based on centralized decisions and actions to encircle the protest and arrest the protestors, but did not certify a damages class for excessive force because the force decisions were made by individual officers, not command staff. The court distinguished *Multi-Ethnic Immigrant Workers Org. Network v. City of Los Angeles*, 246 F.R.D. 621, 625 (C.D. Cal. 2007) ("*MIWON*") because, in *MIWON*, "'the legality of the command decision [to use non-lethal force was] the overriding common question' that met the predominance requirement." *Moss*, 2015 WL 5705126, at *5 (quoting *MIWON*).

Here, the *Monell* evidence could not be stronger. Plaintiffs submitted considerable video documentation of Chief Moore's personal direction of the LAPD's response to the protests at multiple locations on several days, including his involvement beginning on May 29, 2020, when multiple persons were shot with less lethal munitions and arrested. Plaintiffs also introduced radio communications from Chief Moore directing kettling and arrests. Sobel Decl. ¶¶ 29-40.

Other issues that Defendants raised are inapposite. For example, the Direct Force class requires that the class members were "shot with so-called 'less-lethal weapons' and/or struck with batons and did not personally present an immediate and direct threat to any officer." As so limited, this poses the common question of whether those engaged in peaceful protest could lawfully be indiscriminately, physically assaulted as a crowd control method because others in the crowd may have engaged in unlawful and threatening behavior. This determination was certainly within the District Court's "broad discretion to determine whether a class should be certified." *Armstrong v. Davis*, 275 F.3d 849, 872 (9th Cir. 2001).

Defendants' reliance on decisions from courts denying use of force certifications in other *Floyd* protest cases are not helpful. The class definitions, precise circumstances and legal theories differ. For example, Defendants cite *Don't*

*Shoot Portland v. City of Portland*, 2022 WL 2700307 (D. Or. July 12, 2022), where the class definition encompassed all those engaged in Floyd protest activities, "regardless of whether those individuals were engaged in active aggression." *Id*. at \*12. In contrast, two of the three classes here (the Arrest and Infraction Classes) are completely independent of the arrest/force circumstances, and the third expressly requires that class members were "neither violently resisting nor posing an immediate threat of violence or physical harm." Dkt. 174-3.

## IV. WHETHER THE BANE ACT ALLOWS CLASS ACTIONS DOES NOT JUSTIFY THE GRANT OF THE PETITION.

Defendants argue that the petition should be granted to settle whether California's Bane Act (Civil Code § 52.1) allows for class actions, citing a split in District Court decisions (two saying it does and one saying it does not).. This is simply not a basis to grant a 23(f) petition. Defendants are implicitly relying on *Chamberlan*'s second basis for a 23(f) grant, that "the certification decision presents an unsettled and fundamental issue of law relating to class actions…likely to evade end-of-the-case review."

However, even if Defendants' Bane Act interpretation is correct, it would not evade end of case review. Nor would it defeat class certification. They argued this position specifically as to the Infraction Class because they contend that the Infraction Arrests did not state a Fourth Amendment violation, under § 1983 and

25

was not certifiable under §52.1. But there is a false arrest claim for the Infraction Class because the charges did not permit arrest for an infraction, and that claim is unaffected by these arguments. The class certification ruling did not purport to address this issue and did not tie certification to the viability of the §§ 1983 or 52.1 claims. Defendants had the opportunity to move to dismiss the class action allegations in the complaint on this basis or any other and did not do so; indeed, they only raised the issue for the first time during oral argument below. The Court did not address the issue, presumably because it is a merits issue and would not defeat false arrest certification even if they were correct. Defendants can address this contention at later stages (e.g., summary judgment motion, directed verdict motion, or jury instructions), but success would still not defeat certification.

## V. TRYING THIS CASE IS NOT IMPRACTICABLE.

Defendants contend that this lawsuit would force the City to settle or face a potentially ruinous verdict. As discussed above, even if the approval of the three damages classes were not justified, these claims will not disappear. Filing separate class actions for the arrests of multiple persons on different days would only cost the City more to defend many more separate lawsuits.

Without Defendants' saying so directly, this is a version of a "death knell" argument for interlocutory review. "[S]uccessful requests for review under the death knell rationale are relatively uncommon." *3 Newberg and Rubenstein on*

*Class Actions* §7:44 (6th ed.). Death-knell cases are "uncommon" and "discouraged" except in those "rare instances," where "the grant of class status raises the cost and stakes of the litigation so substantially that a rational defendant would feel irresistible pressure to settle." *In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 251 (D.C. Cir. 2013) (quoting *Prado–Steiman ex rel. Prado v. Bush,* 221 F.3d 1266, 1274 (11th Cir.2000)).

Cases that have granted Defendants Rule 23(f) review on a "death knell" basis have tended to involve exceptionally large amounts that are not at stake here. *See, e.g., In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 8 (1st Cir. 2008) (potential $3 billion award involving roughly thirteen million car purchasers); *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015–16 (7th Cir. 2002) (millions of claims across ten years made the case "so unwieldy, and the stakes so large, that settlement becomes almost inevitable—and at a price that reflects the risk of a catastrophic judgment as much as, if not more than, the actual merit of the claims."); *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675 (7th Cir. 2001) (amount involved put "a bet-your-company decision to Bridgeport's managers").

The City of Los Angeles' 2022-23 adopted budget is $11.8 Billion. See

https://californiaglobe.com/articles/la-city-council-approves-11-8-billion-budget-

for-2022-2023-in-14-1-vote/. The amount involved in this litigation is a miniscule portion of a single year of the City's budget. Moreover, the City has dealt with large settlements judgments, including in protest cases, many times. See, e.g., LA Times, "L.A. taxpayers, lawyers could share up to $92.5-million city telephone tax settlement", 8/22/15. But this argument puts the proverbial cart before the horse.

Defendants' crocodile tears argument that certifying the class would somehow jeopardize the rights of class members with serious claims is neither a reason to grant this petition, nor meritorious. As the City notes, there have been individual claims from people who have suffered serious injuries. The vast majority of class members here, including Direct Force class members, have minor injuries fitting the classic reasons justifying class actions because it is individual cases, not a class action, that is impracticable for them. For the relatively few class members with serious injuries, they will have an ample opportunity to determine whether to opt out at the appropriate time.

## VI.  CONCLUSION

For the reasons stated above, the petition should be denied.

Respectfully submitted,


Dated: October 26, 2022          McLANE, BEDNARSKI & LITT, LLP
                                 LAW OFFICES OF CAROL SOBEL
                                 SCHONBRUN, SEPLOW, HARRIS, HOFFMAN &
                                 ZELDES, LLP


                                 By: */s/ Barrett S. Litt*
                                       BARRETT S. LITT
                                 Attorneys for Plaintiffs-Respondents


                                 By: */s/ Carol S. Sobel*
                                       CAROL S. SOBEL
                                 Attorneys for Plaintiffs-Respondents

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rules of Appellate Procedure 5(c)(1) and 32(g), I certify that this **PLAINTIFFS' ANSWER/OPPOSITION TO DEFENDANTS' PETITION FOR PERMISSION TO APPEAL ORDER GRANTING CERTIFICATION OF PLAINTIFFS' CLASSES** contains 5,176 words, excluding the items identified in Federal Rule of Appellate Procedure 32(f).

*/s/ Barrett S. Litt*
BARRETT S. LITT

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** | 22-80117

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Plaintiffs' Answer/Opposition to Defendants' Petition for Permission to Appeal Order Granting Certification of Plaintiffs' Classes

**Signature** | /s/ Barrett S. Litt          **Date** | October 26, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 15**                     **31**                     *Rev. 12/01/2018*